Please proceed, Counsel. Good afternoon, Your Honor. My name is Christopher Nelson. I'm an attorney with Schifrin & Berraway. I represent the lead plaintiff appellant, Bedford Oak Partners. We're here primarily for two reasons. We believe that the district court committed two reversible errors in connection with its dismissal of our securities class action complaint. First off, we believe that the district court erred when it held that we did not plead with the requisite level of particularity, the falsity and C enter, with respect to the company's February 27, 2002, affirmative statement to the market that it was not channel stuffing. The second error that we believe the district court made was that it held that we did not plead, again, with the requisite level of specificity, falsity and C enter, with respect to the defendant corporation's presentation of its financial numbers during the class period, as reported on the 10 Qs and Ks filed with the SEC. Are you abandoning your appeal from the Price Waterhouse case? No, we're not, Your Honor. Oh. I apologize for not being more clear. The issue of the Price Waterhouse appeal relates specifically to the second issue. Financial numbers? Yes. And how about the FEDEX? Yes, the FEDEX we feel we've included in our appeal, but I believe that the core issues here are the two that I've discussed. I'm happy to cover the FEDEX issues as well. Oh, you didn't include that.  I wanted to ask you about your channel stuffing claim. Certainly. You're saying here, you made a distinction both here and in your brief between whether or not there was actual channel stuffing and whether or not there was falsification about that. How can there be falsification unless you prove that they actually were channel stuffing? I believe I understand your question. But if I may say, the issue at this stage of the litigation is not whether we ---- Would you please keep your voice up? I apologize, Your Honor. Is that better? It's a horrible habit I have. The issue here is not whether we can prove whether channel stuffing occurred. The issue is whether we have alleged sufficient facts giving rise to an inference that it did occur. And we believe that we have done that. You said they falsely denied that they did channel stuffing. That's correct. Yes. But then you have to go under the private litigation, securities litigation reform act, you have to say. And the falsification of that denial consists in the fact that. And then you've got to release the facts. I mean, you can't get around the allegation of particularity of falsification by saying, oh, we're not saying that they falsified the figures on channel stuffing. All we're saying is that they falsely denied that they did it. That's a parlor game, but it's not good pleading. I don't believe that we're trying to get around anything with that allegation. Were your allegations with particularity that they did channel stuff and denied falsely that they had channel stuffed? Certainly. There are four facts that we have alleged or other four categories of facts we've alleged that I believe answer your question. First off, as I said, the issue is whether the statement we are not channel stuffing is false. The first point that I'd like to address is the company statement at the end of the class period. About four months after the company made its February 27th denial that it was channel stuffing, the company turned around and said the exact opposite. The company admitted, and they do not use the magic words channel stuffing, which is a point that defendants have hit on very, very hard here. But what they say is, quote, certain products that were shipped in the first quarter may have taken similar sales from the second quarter. That's the language of the defendant company. So what? So what, Your Honor? So what? How does that support a falsity allegation regarding channel stuffing? That's a business decision. Your Honor, we don't believe that that's necessarily a business decision because that particular admission, we believe, relates very, very closely or is very, very similar to the language that this circuit used in the Steckman v. Hart Brewing case, where in the language of this circuit, channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer. And what are the facts to support that, that there were artificial inflation? What sales were inflated? What shipments were stuffed in one quarter? And what sales fell in the second quarter? Those are specific allegations that you have to have on the PSLRA. I believe so, Your Honor. But I believe that that particular standard and the standard addressed by the district court was whether channel stuffing is pleaded with respect to false financials, an accounting violation. You would necessarily, if you were going to assert claims that the reported financials were false, which we are not taking up for the purposes of this appeal, plead the names of the distributors, the amounts of product that were actually channel stuffed. And we have three confidential witnesses who we believe provide allegations of fact regarding those issues, which when taken in conjunction with the company's admission at the end of the class period, as well as the reaction and characterization of analysts. So where is your allegation as to how many shipments were reported in the first quarter, which should have been reported in the second quarter? Number one. Number two, that they knew that. Certainly, Your Honor. Not that they discovered it later through some error. We have statements from three confidential witnesses. The first one is the Southeastern Market. Now, where is your allegation that the shipments reported in the first quarter were knowingly falsely reported in the first quarter because they should have been reported in the second quarter? Paragraph 117D of the Second Amended Consolidated Complaint, Your Honor. All right. We allege there from this particular witness that he was directly ordered to channel stuff by Chris Dax, who was the company's director of sales and marketing, and that Chris Dax received his direction directly from Defendant Panitch. Channel stuffing itself is not illegal. No, it is not. You have to show that it artificially inflated the ICN stock prices, do you not? Yes, Your Honor. That's a causation question, I believe. What's the excerpt of record citation to the paragraph? If Your Honor, would you excuse me for a moment? Yes. Is this the Second Amended Complaint? Yes. I think that starts at ER 85. Beg your pardon? That starts at excerpt to record 85. I'm looking at my excerpts, and yes, it starts at 85, and it's on page 147 of the excerpts, which is paragraph 117C. We also plead in subparagraph half. But that doesn't say that the first quarter or whatever quarter the channel stuffing occurred in, then artificially inflated the sales figures, and then those figures dramatically dropped because of that intentional channel stuffing in the second or the subsequent quarter, and that's what you need under the PSLRA. I respectfully believe that that necessarily follows from our allegation, Your Honor. If we allege that in subparagraph B, if we allege that during the fourth quarter and first – I'm sorry, the fourth quarter of 2001 and the first quarter of 2002, that the company channel stuffed with respect to certain distributors six to eight months worth of product that would eventually have to be worked through, then it necessarily follows that their revenues during that period were inflated by, however much the six to eight months worth of product. But it doesn't show that the second quarter they dropped necessarily. I believe that we allege that at paragraph 156 of that same document, if I'm not mistaken, where we cite the company's statement that as a result of distributors working through this product, the distributor reduction of inventory to appropriate levels would cause ICN to lose $10 to $12 million per quarter. Counsel, your citation of 117D, the second amendment complaint, A, does not mention the first quarter or the second quarter at all. B, doesn't state that channel stuffing occurred during this period. Is that the best you can do? That's what I have here in the complaint, Your Honor. I have that in basically through paragraphs, subparagraphs C through F is what I have with respect to that allegation. I believe we also have the statements of analysts who responded to the company's disclosure and the analysts uniformly called what the company admitted at the end of the class period, channel stuffing. Counsel, you realize that you have a very high burden under the PSLRA of specificity. Certainly, Your Honor. That's the difficulty we're having. Certainly. The case authority is very clear regarding the extent to which you have to specifically allege dollar amounts and specific products and specific timetables to meet your pleading obligation. Well, I would again respond to that by saying that that is the standard addressed in the Stekman v. Hart Brewing case, which dealt with whether financials were falsified. We're not alleging that the financials themselves for the purpose of this appeal were false. We're merely alleging that the company said it was not doing something which may have been perfectly legitimate at a time when it was doing it, and that's a sort of false. But you haven't alleged what they were doing, which the company, as you claim, falsely denied. You first have to say they did this and they falsely denied it. You can't just say they falsely denied general matters. Okay, Your Honor. May I move on to my second issue? Sorry. May I ask one more question? Certainly. The Inmate Dow Systems case, the Ninth Circuit case, requires plaintiffs to allege the approximate amount by which revenues were inflated, the products involved, the dates of the transactions, and the identities of employees involved in the transaction. None of that appears to be here. What is your response? My response would be the same as my earlier response, which this Court has disagreed with. Same response, sorry. Go ahead. With respect to the inflated asset values, we also believe that the Court erred. We base all of our allegations of the falsity of the company's reported financials arising out of the company's ICN Russia subsidiary were materially false and misleading during the class period. Specifically, we allege that the company materially misstated the asset values. They claimed that the assets were worth $162 to $164 million during the class period. Our allegation that these reported values were false arises out of the statements of one of our named witnesses, Victor DeRodney, who was the company's vice president of corporate development for ICN Russia, who was hired for the express purpose of evaluating these assets, valuing them and finding out what they were worth for the company. What rule under FASB 144, or GAAP, was violated by the company? The company violated FAS 144. We allege that- In what way? There are two specific violations we allege. First, we allege that FAS 144 dictates a write-down, and if you'll allow me to turn to the specific language. It states that a long-lived asset group shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable. All right. Now, what events or conditions change do you allege occurred which under FAS 144 would require a write-down? Paragraph 8A of FAS 144 states that a significant decrease in the market price of a long-lived asset is a circumstance that requires a write-down. We also allege- What was the decrease in the market value that you allege? We allege several levels. First off, we identified very specifically through the allegations of Mr. DeRodney, statements of Mr. DeRodney, $15 million worth of assets that were overvalued. We identified them by exact number- No, no, no, no, no. That's the conclusion of Mr. DeRodney. What market events do you allege which approximately caused the decrease in value? I'm sorry. The decrease in value of the assets? Uh-huh. Those are specifically alleged at paragraph 69B of the second amended complaint, which is page- Your claim that they had no experience doing business in Russia, that's not a significant decrease caused by an event, is it? It's not necessarily caused by an event. It doesn't have to be caused by any one particular event. All that 8A of 144 requires is that there is a significant decrease in the carrying value, and that necessitates a write-down. Secondarily, FAS 144, according to the case law that we cited in our briefing, requires an annual testing, and if the assets are impaired, they must be written down. So if a company puts senior management in and has no experience doing business, they must immediately decrease the value of their assets? Not at all, Your Honor. If senior management is warned directly, as they were in this particular case, that the assets need to be written down, then they need to be written down. They're warned by Mr. DeRodney. His first role with these assets was in trying to buy them cheap for Gazprom, right? Yes, Your Honor. So he obviously badmouthed them. Well, Your Honor, our allegations relate specifically to the period when Mr. DeRodney was hired by the company in early 2001. And they hired him. Yes, they did hire him. And then he started making these claims, right? Yes, Your Honor. And that's what you rely on as the events which would justify under FAS 144 as a markdown? Certainly, Your Honor. And in response, Mr. DeRodney's discussions with the company, specifically Mr. Defendant MacDonald and Defendant Panitch, the company decided to write down these assets by $40 million in, I believe it was May of 2001. He had two meetings with Mr. MacDonald, two meetings with Mr. Panitch, and sent 12 e-mails to Mr. DeRodney and told them what he thought was going on, why the assets needed to be written down, and that in response the company planned to write the assets down by $40 million, but did not write those assets down only because they did not want to scuttle a corporate bond offering in July of 2001. If I may reserve the balance of my time. Actually, excuse me, before I do that, I just wanted to address something that I hit in the briefing and didn't hit here at oral argument, is the type of inquiry that we're talking about, the propriety under FAS 144 is almost uniformly disfavored by circuits across this country because it's necessarily a specific fact-based inquiry that should be beyond the scope of a motion to dismiss. Thank you. All right. Thank you, counsel. Thank you. Good afternoon, Your Honors. Eric Waxman for defendants ICN. Mr. MacDonald, Mr. Myers, Mr. Giordani. Your Honor, I would like to turn in a second to the specific allegations that counsel just discussed, but before I do that, I think it's important to talk about how it is that we arrived here. This appeal presents a case where the district court judge carefully reviewed, not once, but twice the allegations of plaintiff's complaint, and in a thoughtful manner applied the standards that have been set down by this court in numerous decisions with respect to cases that are governed by the PSLRA. In dismissing the first amendment complaint, the district court gave plaintiffs a road map that told them line and verse what they needed to plead in order to satisfy the You can assume we've read the record. The point that I really wanted to get to, Your Honor, in the introductory remark, is that the district court's application of those standards are within the mainstream of this court's jurisprudence. Although the district court cited Tavantive and Mercani, I almost find it more interesting that those same standards are articulated by the court in Dow, in America West, and in Oracle. And in those decisions where this court found the complaints were sufficient to meet the stringent requirements of the PSLRA, the level of detail and the level of particularity when you look at those complaints and you look at the complaint here, it's a difference of night and day. If you take a look, Your Honor, at Dow for a minute. In Dow, Judges Preggerson, Fletcher, and Brunetti repeated, as is the case in many cases, that the stricter standard for Siena necessarily requires a stricter standard for pleading falsity. In Dow, the plaintiffs cited to 27 confidential witnesses, many of whom worked directly with the defendants, not through some intermediary, which is what the confidential witnesses in this case say. The complaint in Dow explained in detail how the company's own accounting policy was violated. And as was raised by the court here, the complaint not only identified the particular transactions with specificity, but the approximate amounts by which revenue was overstated, the dates of the improper transactions, the identity of the customers, and the employees who were involved in those transactions. Indeed, the complaint went so far as to identify a particular contract where defendant Dow himself paid $100 to the confidential witness to go to a warehouse, plug in some computer equipment, and bill eight hours. Importantly, in that case, the court pointed out that merely alleging a violation of GAAP is not sufficient. That's not enough to demonstrate a strong inference of Siena. What you have to do is explain how the adjustments affected the financial statements and how those adjustments were material to the overall financial condition of the company. None of that information is in our complaint before the court, the Second Amendment complaint. Again, in Oracle and America West, Your Honors, specific details with respect to America West, numerous correspondence with the FBA, who wrote the letters, who received the letters, what the substance of the letters were. Settlement negotiations detailed about what the company knew at the same time it was making statements about the fact that they had the maintenance issues behind them. Again, Your Honor, if you compare the details and the cooperation in those complaints and look at the Second Amendment complaint, it becomes clear that a reversal of the district court here would not only be unwarranted, but would create confusion for the district courts. And it would create confusion because it would be a substantial departure from the standards that this court has carefully established over numerous decisions by numerous panels. Now, with that backdrop, I'd like to go to the channel stuffing claim and then to the Russian claim, Your Honor. The district court described the substance of the allegations as really being nothing more than fraud by hindsight and really a business decision simply to provide incentives to meet sales. The court's citation to Ashworth is instructive. When you look at what happened in Ashworth, the company made a statement that its inventory levels were adequate, and the plaintiffs claimed that that statement was false because the company engaged in various aspects of channel stuffing, providing favorable terms, giving discounts, unlimited rights of return. Counsel, did you hear our questions to opposing counsel regarding the channel stuffing claim? I did, Your Honor. Okay. So do you want to respond to those? We understand what the district court did. I think, Your Honor, again, it's precisely what this panel, the questions I think were appropriate questions. There's no detailing at all what products were involved, what the amounts of the products were, the specific transactions. All that detail, none of it is present in the complaint. Now, counsel pointed to a statement. He says, well, this is where they described, they made a false statement. That was the J.P. Morgan analyst report, Your Honor. The only statement in that report is unattributable to any of these defendants, any of these defendants. And the court there, I'm sorry, the authority that the plaintiffs cite to, Your Honor, demonstrates why that statement is irrelevant to any decision here. First of all, there's no entanglement with that statement, as there has to be if you're going to attribute an analyst report to a defendant. There's no allegation, conclusory or otherwise, that the analyst report was sent to the company in draft form for the company to comment on, or that the company was involved in any way in the preparation of that report. With respect to the conduit theory, Your Honor, it is insufficient, it's insufficient to simply have a statement that management believes, discussions with management indicates. And that authority, Your Honor, is the very authority that the plaintiffs cite in their brief. So, again, you can't even attribute that statement to the company. Now, if you take a look at what Mr. O'Leary said, again, you have to look at the circumstances. That's what the decisions tell us. You have to look at the circumstances. New management coming in. Mr. O'Leary had been on the job a few weeks. Nowhere does Mr. O'Leary say the company engaged in channel stuffing. What Mr. O'Leary said is that the company made a proactive decision to take down inventory. There's no suggestion in that that the wholesalers, that's the company's main customers, were unwilling to buy under the same terms and conditions that they had been buying under for 20 quarters. Twenty quarters. That's not a scheme, Your Honor, to inflate sales in one quarter and take away sales from the next. It's alleged that this was a longstanding practice. And Mr. O'Leary says that the company made a proactive decision. It wasn't reactive. Two, Mr. O'Leary said, may have taken some sales. He didn't say it did take sales. He didn't say the amount of sales. So, again, Mr. O'Leary's statement simply, I don't think it creates any inference of CNR. It certainly doesn't create a strong inference of CNR. With respect to plaintiff, also I want to address this point, Your Honor. We heard that they're not really challenging that we engaged in channel stuffing. And they said it's just the denial of channel stuffing. And I think the question was appropriate at last. How do you prove the falsity of that unless you show that you are engaged in channel stuffing? And the district court found that they hadn't pled any facts suggestive of that. But, Your Honor, this is an accounting case. When counsel tells you that they're not challenging the way we accounted for the sales, it's simply not the case. Although they do disavow any claim that ICN improperly inflated its revenues, and they do that at page 14 of their brief. In their opposition to ICN's motion to dismiss the second amended complaint, and this is the record site for this is at 136, Your Honor. The subheading in that brief is defendant's accounting fraud via channel stuffing. That's what they told the district court. Defendant's fraud through channel stuffing. In their second amended complaint, paragraph two, that's the excerpt of record is at number two. Defendant's engaged in a pervasive and intentional scheme to inflate revenue. Well, when that's your allegation, you must provide the court with particularized facts to support it, as was the case in Dow. You don't have that here. There's no there there. Now, counsel did reference some confidential witnesses. I think we've addressed all of that in our brief. The one point I do want to make, and I think it's worth noting, the Californian territorial manager, Your Honor, who alleges that she believed, doesn't give the basis for the belief, but said she believes the company was engaging in similar practices, doesn't describe the practices, with respect to ribavirin, the company's flagship product. Well, the second amended complaint itself admits that the company doesn't sell or manufacture ribavirin. It's a licensing arrangement with Shearing Plow. The company does earn substantial revenue in terms of royalties. There's no question about that. It was an enormous share of revenue for the company. But the company doesn't sell it. The company doesn't manufacture it. It's a pure licensing agreement. So there's just no reliability to these confidential witnesses. And that's even if you assume that they have the same level of detail that you had in adaptive broadband or in Dow or the other cases we cited, and it's not there. Counsel, was Price Waterhouse Counsel going to address the court? Yes, Your Honor. Then perhaps you might want to cede a little of your time. Thank you, Your Honor. Did the Court have any specific questions for me? How about the question I said right now? Yeah. Very quickly there, Your Honor. All you have there is Mr. DeRodney's uncooperated opinion. The Cattell case that we cite, Your Honor, which isn't mentioned, isn't distinguished, nothing, lays out what you need under 144. First, you have to have a change in circumstance. The complaint makes clear there's no change in circumstance. According to Mr. Rodney, the operations in Russia was a shambles from the get-go. Now, I do think there was a change in circumstance, Your Honor, but it's a change for the better. Our operating conditions improved by more, our operating results, rather, improved by 70%. In the first quarter of 2002, we turned a profit. So if there was a change in circumstance, it's because the operations were improving significantly. So you have Mr. DeRodney's uncooperated opinion. There was no issue with respect to credibility. The District Court credited Mr. DeRodney as having knowledge about the valuation of assets if you're going to sell them or buy them. That has nothing to do with the accounting test for impairment. So, one, you don't have a change of events or circumstances, and two, even if you do, because GAAP has a wide latitude of accounting treatments that are permissible, you must state a claim for a GAAP violation with particularity. Again, in CATEL, the Court laid out exactly what you need to do. You need to take the undiscounted cash flows over the life of the asset, add them up, and see whether or not the sum of those undiscounted cash flows supports the carrying value. Mr. DeRodney not only doesn't perform that analysis, it appears he's not even aware that that is the appropriate analysis, and that's okay because he doesn't purport to be an expert in accounting. And finally, Your Honor, at most, what you have here is a disagreement between Mr. DeRodney and senior management. That doesn't give rise to a securities claimant, particularly when it's a disagreement about the timing over a write-down, which is the Seventh Circuit pointed out in the DiLeo case. That's not fraud. It may not even be negligence. But there are disagreements within management every single day at any major corporation. But if you ask, did senior management have a basis to disregard Mr. DeRodney's opinion, of course they did. Counsel, you're below six minutes at this point. I apologize, Your Honor, and I thank you for the Court's indulgence. May it please the Court, Thad Davis from Quinn Emanuel for PricewaterhouseCoopers. Frankly, Your Honors, I'm left wondering why Pricewaterhouse is here. Judge Bea obviously had to remind counsel to assert his claim about his appeal point about Pricewaterhouse. We weren't mentioned a single time in his argument, and I suppose that's his right. But what was also interesting from Mr. Nelson's argument was that he says that they're essentially admitting that the financials were not false, at least as to any of the revenue or channel stuffing of those related allegations. In that regard, Pricewaterhouse is not mentioned with regard to any of those allegations about channel stuffing. Excuse me, fake sales, sales projections, photonics, product defects, off-label uses, overstatement of Russian inventory. No mention of my client. The only mention of my client is with regard to the Russian assets. And specifically, I think it's worth looking at the record of what's specifically alleged. There are only 14 paragraphs out of over 200 that mention Pricewaterhouse. Most of them are boilerplate recitations of GAAP or just conclusory statements that the opinions and financial statements were false, without more, which, of course, falls far short of the PSLRA standards for pleading. The one paragraph that actually has any remotely any allegations of fact, paragraph 63, which is in the excerpt's record at 19 and 20, says in completely conclusory fashion that DeRodney turned to PwC for assistance, believing they would have knowledge of the value of the assets and information supporting those values. According to DeRodney, however, the PwC partner in charge of ICN Russia's audit was an Englishman named Tony, who, along with his staff, was completely unaware of the value of the buildings or whether supporting information existed for those values. Instead, the only thing Tony was interested in was leasing space in a building he owned to ICN Russia for use as a drugstore. According to DeRodney, PwC never did an appropriate investigation to determine the value of ICN Russia's assets and whether and when they should have been impaired. At the most, that's negligence. Yeah, that's what Judge Carter, the district judge, found. At most, taking it at face value, crediting it in the most favorable light to the plaintiff, as is required, despite the complete lack of any factual specificity of when this conversation happened, what time, what assets were referred to, how much the overvaluation was supposed to supposedly have been, that even if you take this at face value, it's at most perhaps carelessness, is what the district court said. So we've – and that's it. That's all we have to go on. That, of course, doesn't meet fraud pleading standards, PSLRA standards. It doesn't allow a defendant like Price Waterhouse to defend the claim, to prepare to defend the claim, to respond to the claim. And fraud claims are serious. They're supposed to be public specificity. And in the securities area, there's the extra layer, obviously, the policies of discouraging these sorts of complaints that are just sort of thrown up to see if they'll stick. We understand. We understand your argument. So, okay. Thank you, counsel. Thank you. Do you want to speak, Ms. Brandt? Good afternoon, Your Honors. May it please the Court, Lisa Brandt for Appellee Milan Ponich. I only have a few minutes, so I want to focus in on appellant's failure to adequately plead scienter against my client. Unless the Court has questions, I'm not going to discuss Mr. Ponich's stock sales because I believe the law is clear and the briefs demonstrate that in light of the context, just like the other individual defendants, Mr. Ponich's sales were not suspicious and cannot form the basis of an inference of scienter. As to the other scienter allegations relating to Mr. Ponich, there are two main problems. First, appellants do not allege that Mr. Ponich acted with the requisite scienter with respect to the specific violations alleged. Rather, when distilled to their core, appellant's allegations amount to basically Mr. Ponich was a hands-on manager. He received reports. He attended certain meetings. For instance, with the channel stuffing claim, if you look at paragraph 117 of the complaint that counsel actually referred to and read not what their brief says it says, but what it actually says, it alleges that Chris Dax, director of sales, quote, reported to Ponich and other senior management and, quote, received instructions from Ponich and other senior management. It doesn't say what instructions. It doesn't say what was reported. It doesn't have any of the corroborating details necessary under the Dow standard. And it certainly doesn't connect Mr. Ponich to the alleged statements made in February phone call that the analyst conveys. Similarly, the Russian assets allegations, the appellant alleges that Mr. Ponich attended two meetings with Mr. Durandi where the asset problems were discussed and were sent e-mails. Again, lacks the requisite specificity required to show that Mr. Ponich knew or acted with deliberate recklessness in not writing down the assets. It doesn't connect Mr. Ponich in any way to that. The second say answer problem allegations that they have is that appellant's complaint basically does exactly what the heightened pleading requirements under the PSLRA were designed to prevent. That is pleading fraud by hindsight. Appellant essentially argues that because new management took ICN in a new and different direction than Mr. Ponich and his old team, that Mr. Ponich and his team must have been doing something illegal. That is just, as the Court found, fraud by hindsight and doesn't meet the level of specificity under the PSLRA. Thank you. All right. Thank you, counsel. The bottom. Thank you. I will try to run down the concerns raised by opposing counsel very quickly as I have a limited amount of time. First off, Mr. Waxman complained that our case is distinct from the other cases where the Ninth Circuit has reversed the dismissal of the securities fraud class action and that we don't have nearly the volume of confidential witnesses that those cases had. What is specificity? Well, we do not have the same level of specificity perhaps with respect to the channel stuffing allegations. I believe we do have more specificity with respect to the false financials at the Russian subsidiary. We have a named witness who was specifically charged with valuing these assets. Quantity does not equate to quality. If we have the individual who was specifically charged with valuing these assets and he says that they were overvalued, needed to be written down, that the company concurred with his judgment and planned to write the assets down by $40 million off of $160 million, basically chopping 25 percent of the value of the company's Russian operations off the top, it's hard to see how that is not specific enough for us to proceed with our claims. There was a new argument raised for the first time on appeal with respect to the February 27th statement. Defendants' argument that J.P. Morgan's recitation of what transpired during their conference call is not appropriate for this appeal because it's the first time they've raised it. They didn't raise it at the district court. Mr. Waxman continued and argued that we specifically have alleged in our complaint an accounting fraud case. We did allege an accounting fraud case with respect to the channel stuffing at the district court, but we are not required to appeal what Mr. Waxman would like us to appeal. If we wish to appeal the one specific statement, then we are permitted to do so. With respect to PwC, I believe the position was taken that they were merely careless. Well, in the DSAM case, carelessness is not carelessness here, but an accounting practice is actionable if it is so deficient that the audit amounted to no audit at all or it was an egregious refusal to see the obvious. That's what we have here. We have a direct warning and a meeting between the PwC audit partner who was actually named. We've given you a reason why he individually and personally stood to profit by his dealings and attempted to do so, and I believe we've met the DSAM standard there. With respect to Mr. Panich, I believe that the Sienta allegations with respect to the Russian write-down allegations are more than sufficient. We have two meetings where it was discussed. We have 12 direct e-mails, and we have a planned write-down, and we have a motive for them not to take the write-down to complete this corporate offering. I don't see how you get more specific than a direct warning to an individual defendant. Thank you. Thank you. Thank you to both counsel. The case is submitted for decision by the court, and we are adjourned. Thank you. All rise.
judges: D.W. Nelson, Rawlinson, Bea